**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 15-602-1** |
| DAVID M. DUNHAM, JR. | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, by John Gallagher, Assistant United States Attorney, and Jeffrey Bossert Clark, Assistant Attorney General, by Adam C. Cullman, Trial Attorney for the United States Department of Justice, respectfully submits this memorandum to assist the Court in the trial of this matter.  The trial is scheduled to commence on April 8, 2019.

## I.      THE INDICTMENT AND FACTUAL BACKGROUND

Defendant DAVID DUNHAM was indicted by a federal grand jury in the Eastern District of Pennsylvania on or about December 17, 2015, for conspiracy to commit wire fraud, conspiracy to defraud the United States, and various substantive counts, including subscribing false tax returns.  *See* Docket Entry 1.   These charges arise from the defendant's participation in a green energy scam wherein the defendant and his co-defendant, who has pled guilty, falsely claimed to have produced and sold renewable fuel, resulting in the misappropriation of tens of millions of dollars in payments, subsidies, and other benefits.  The defendant also participated in

many cover-ups intended to deceive government and private sector auditors who were investigating his fraudulent schemes.[1]

At trial, the government shall introduce extensive evidence that proves the guilt of the defendant.  In sum, such evidence will include the following:

### Regulatory Background

Expert testimony shall establish that federal statutes, including the Energy Independence and Security Act of 2007 (the Act) required the U.S. Environmental Protection Agency (EPA), the U.S. Internal Revenue Service (IRS), and the U.S. Department of Agriculture (USDA) to encourage the production and use of renewable (non-fossil) fuel in the United States.[2] Specifically, the Act directed these agencies to write regulations and administer tax credits to ensure an increase in the amount of such fuel.

In order to carry out the Act's mandates, the EPA established a program, the Renewable Fuels Standard (RFS). The RFS program required petroleum refiners and importers to introduce a minimum amount of renewable fuels into the national fuel mix each year. This program was expanded in July 2010 with the establishment of the RFS-2. The refiners and importers could fulfill this mandate by purchasing sufficient "RIN" credits[3] generated by renewable fuel

---

[1]  At trial, the government intends to ask the Court to dismiss the following charges against Dunham, most of which relate to conduct committed by his co-defendant: Counts 2-3 (18 U.S.C. §1001), Counts 12-21, 28-29, 32-33, 36-37 (18 U.S.C. §1343), Counts 57-69 (26 U.S.C. §7206), and Counts 70, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94 (18 U.S.C. §1343).

[2]  The introductory paragraphs of the indictment set forth a summary of the incentive programs established by the EPA, IRS and USDA to encourage the production and use of alternatives to traditional petroleum-based fuel. Dunham has favorably approved of the government's summary, stating "The Indictment generally but effectively summarizes the complex regulatory environment governing the tax credits, grants, and generation/sale of RINs related to the operation of companies like Smarter Fuel and EERC.  In fact, approximately 10 pages of the Indictment generally summarize 'the EPA's RFS-2 Program and RINs,' 'the U.S. Treasury Department Tax Credit Program,' and 'the U.S. Department of Agriculture Advanced Biofuel Payment Program.'"  P. 4, FN 3, Doc. No. 71, filed by Dunham on 02/15/2017, referencing Indictment at pages 2-12.

3 Upon the establishment of RFS-2 in July 2010, these RIN credits became entries in an online electronic database maintained by the EPA. The defendant began generating RINs upon the establishment of RFS-2.

producers upon the creation of qualifying fuels. Among other requirements to generate valid RINs, producers had to produce a final fuel, had to follow the process described in their registration materials, and had to put specified language on the product transfer document transferring title to the fuel and/or RINs. RINs could only be claimed one time on a given volume of fuel.

Similarly, Section 9005 of the Food, Conservation, and Energy Act of 2008 authorized the establishment of the U.S. Department of Agriculture (USDA) Advanced Biofuel Payment Program (ABPP). The purpose of the ABPP was to support and expand production of advanced biofuels by providing payments to eligible producers. To accomplish that goal, the program provided payments to producers of advanced biofuels based on the amount of fuel they produced and sold. There were also additional "incremental" payments for companies that produced increasing amounts of fuel from one year to the next. The ABPP required that the fuel be a finished fuel and be sold at arms-length to a third party. Payments could only be claimed for a given volume of fuel one time.

The Energy Independence and Security Act of 2007 also required the U.S. Internal Revenue Service (IRS) to encourage the production and use of renewable fuel in the United States. To this end, the IRS administered a program of refundable tax credits available to registered producers of certain renewable fuels and fuel mixtures. These credits were available in 2009, but not in 2010. However, in 2011 the tax credits were reinstated, and made retroactive for qualifying production in 2010.

One of these tax credits was the alternative fuel mixture credit, which was a $.50 per gallon refundable credit available to producers of alternative fuel mixtures. These credits were

paid by check from the U.S. Department of Treasury. Unlike the EPA and USDA programs, the

IRS tax credit at issue did not require the claimant be the producer of the alternative fuel itself,

but rather be the producer of the mixture. That is, the entity which first mixed the alternative fuel

with taxable fuel was the entity entitled to claim the credit, regardless of whether they had been

the one to produce the fuel itself.  To qualify for the credits, the claimant must have produced a

mixture of unmixed alternative fuel and taxable (i.e. petroleum) fuel and then sold the resulting

mixture for use as a fuel (or used it as a fuel in its trade or business). Credits could only be

claimed on a given volume of fuel one time.

### Defendant Dunham's Crimes and Cover-Ups

The defendant produced very little fuel that qualified for the credits at issue. Nonetheless

he claimed to have produced and sold millions of gallons in compliance with each of the

programs:[4]

| 2010 – Gallons Reported | | | |
|---|---|---|---|
| Month | **IRS** | **EPA** | **USDA** |
| January | 258,317 | | |
| February | 310,653 | | |
| March | 394,221 | | 939,190 |
| April | 463,060 | | |
| May | 535,651 | | |
| June | 620,555 | | 1,595,266 |
| July | 706,532 | 202,953 | |
| August | 716,943 | 320,289 | |
| September | 952,238 | 444,140 | 2,351,713 |
| October | 1,220,362 | 966,723 | |
| November | 1,521,600 | 1,388,591 | |
| December | 1,442,961 | 1,289,348 | 1,378,428 |
| **Total Gallons** | **9,143,092** | **4,612,044** | **6,264,597** |

---

4 Defendant Dunham's co-conspirator, Ralph Tommaso, who has already pleaded guilty,
falsely claimed similar levels of production.

4

| 2011 – Gallons Reported | | | |
|---|---|---|---|
| Month | **IRS** | **EPA** | **USDA** |
| January | 477,972 | 628,577 | |
| February | 348,861 | 469,911 | |
| March | 567,802 | 441,526 | 1,394,635 |
| April | 382,344 | 112,662 | |
| May | 425,765 | 3,481,037 | |
| June | 732,497 | 307,982 | 1,174,727 |
| July | 574,941 | 229,235 | |
| August | 598,613 | 318,831 | |
| September | 853,704 | 602,396 | 1,677,608 |
| October | 782,861 | 357,600 | |
| November | 1,608,568 | 663,851 | |
| December | 1,794,240 | 275,859 | |
| **Total Gallons** | **9,148,168** | **7,889,467** | **4,246,970** |

These claims stand in stark contrast to Dunham's actual production at the time, particularly in 2010. An analysis of Smarter Fuel's sales records, contained within its accounting software show a far lower volume of production. In 2010, Dunham's books reports sales of approximately 4.3 million gallons. What is more, this figure includes over a million gallons of "ghost" product transactions,[5] that is, gallons which existed only on paper, and never passed through Dunham's facility. These numbers correspond to production figures Dunham reported to third parties as well.

Furthermore, what production did occur was largely ineligible for the credits Dunham was claiming. The gallons at issue were ineligible for a multitude of reasons, but the most common ones were the following:

---

5 These "ghost" gallons were transacted with a company called Higher Ground Energy, and are discussed in greater detail below.

1. *Sales of Feedstock*

All three programs require that the material produced, and the material on which credits are claimed, actually be a fuel. Sales of feedstock (the name for the raw ingredients used in the production of renewable fuel) were ineligible. The rationale for this is two-fold: first, the programs were intended to incentivize the production of fuel. Second, when a company claims credits on a material, and then sells it as a feedstock, there is a high likelihood that a second set of credits will be claimed by the company actually producing the fuel.

The defendant was aware of this restriction. In July 2010, he participated in a recorded conversation with CBIZ, a marketing company contracted to package Smarter Fuel and EERC for sale. During this conversation, the defendant confirmed that when he sold feedstock to biodiesel producers, he could not claim credits. He likewise reiterated his knowledge during a consensual interview during the execution of a search warrant at his office in July 2012. During this interview, Dunahm stated that credits should not have been generated on sales of material to Hero BX, REG, and Kolmar, each being biofuel producers who used Dunham's product as a feedstock.

Nonetheless, throughout 2010 and 2011, the defendant claimed millions of gallons of feedstock when requesting credits for all three programs. He claimed credits on over 1.2 million gallons of used cooking oil sold to Hero BX, a large biodiesel producer. He claimed credits on hundreds of thousands of gallons of used cooking oil sold to Kolmar and REG, two more biodiesel producers. Each of these companies required that the defendant sign a feedstock verification form, acknowledging that what he was providing was feedstock.

6

Smarter Fuel's top five customers in 2010 were all biofuel producers who purchased

Dunham's product as a feedstock.6

| | Sales | (Gallon Conversion) |
|---|---|---|
| **Hero BX** | 1,807,930.94$ | 828,313.33 |
| **Bunge North America** | 720,208.24$ | 348,458.67 |
| **Viesel** | 406,607.48$ | 338,036.60 |
| **Environmental Energy** | 430,798.70$ | 244,206.67 |
| **American Energy Independence Company, LLC** | 413,290.99$ | 205,409.03 |

Likewise, in 2011, five of the top six customers for Smarter Fuel's product were again

biofuel producers who purchased Dunham's product as a feedstock.7

| | Sales | (Gallon Conversion) |
|---|---|---|
| **Galavan Supplements** | 7,565,862.65$ | 2,154,842.67 |
| **American Energy Independence Company, LLC** | 4,373,042.18$ | 1,580,558.00 |
| **MBP Trading** | 1,464,693.97$ | 1,247,556.90 |
| **Hero BX** | 2,797,373.40$ | 787,589.33 |
| **Kolmar Americas** | 503,069.50$ | 134,151.87 |
| **Viesel** | 422,370.69$ | 131,570.67 |

The evidence that Dunham knew that he was selling feedstock, and that this was

ineligible for RINs, in clear. In a recorded conversation in 2010, Dunham stated that when he

sold to feedstock to biodiesel producers, he couldn't claim RIN credits. Nonetheless, Dunham

---

6 One additional customer from this period was Higher Ground Energy (discussed later). The Higher Ground Energy material on which Dunahm claimed RINs never passed through Smarter Fuels' facility, and is not being included for that reason.

7 Smarter Fuels largest customer in 2011, Galavan Supplements, represents product that Dunham and Tommaso sold to Higher Ground Energy ("HGE") for transport and sale to Europe.  The defendants concocted this scheme to avoid directly exporting the product, which would have impacted their ability to claim RINS. Because the RFS program was intended to reduce the use of petroleum in the United States, any RINs generated on product that was exported would have to be retired (i.e. terminated) .  Dunham and Tommaso nonetheless claimed RINs on these sales, and shared the proceeds with the owner of HGE.  Another large customer, MBP, represented material that was collected, stored, and sold abroad.

generated millions of RINs on such sales. He even directed employees to generate RINs on such transactions in email. Later, when he was audited, Dunham directed that the names of feedstock customers be changed to hide his feedstock dales.

There is additional evidence of Dunham's knowledge regarding his feedstock sales. As seen above, Dunham claimed credits on over 1.5 million gallons of used cooking oil sold to American Energy Independence Company (AMENICO), a small renewable fuel producer based in New Hampshire. Early in their business relationship, on March 10, 2011, a representative of AMENICO complained that Dunham's paperwork suggested he was selling them fuel, and asked him to make sure they reflected "the actual product we are buying and state UVO [used vegetable oil] or yellow grease." The following week, Dunham responded saying, "I got your email about the invoicing needing to say UCO, I'll make that change." And yet, for the rest of the year, Dunham continued to claim credits on these loads. In December, following publicity surrounding several charged "RIN fraud" cases, Dunham attempted to insert language once again suggesting he was selling fuel to AMENICO. Tony Giunta, one of AMENICO's owners responded, saying "obviously there must be some confusion. AMENICO is a renewable fuel producer. As such, we only purchase used cooking oil feedstock from Smarter Fuel. The language you forwarded is for a renewable fuel and is a product we do not purchase nor do we have a desire to purchase." Ralph Tommaso and Dunham then had the following email exchange:

RT: Wtf? I thought they knew
DD: Sarandis knows. Tony must not, or is pretending he doesn't based on the current heat.
RT: lets sell to them until the tank empties.

8

The following month, Smarter Fuel was audited by an engineering firm on behalf of Shell, one of their RIN customers. During her on-site visit, Elizabeth Hilbourn, one of the auditors, asked Dunham whether he ever sold to biodiesel producers. He falsely replied that he did not. Following her visit, Hilbourn requested examples of paperwork used by Smarter Fuel. One of the documents she requested was an invoice sent to Hero BX. When she requested the supporting documentation, Robert Vitale, the CFO of the company, forwarded her request to Dunham and they had the following email exchange.

R.V.   See attached she did select one of the Hero BX [invoices,] she must have our invoice from there to cross check.

D.D.   Dunham replied, "crap…… are you in tomorrow?"

A few days later, an example of the requested invoice was provided to Hilbourn, however at the direction of Dunham, the name of the customer had been blacked out, and the original invoice which had no product description had been altered so that it now stated ""Off-Road Transportation Fuel/Non-ester renewable; No Associated RINS attached; This volume of fuel is used in its designated form without further blending."  Hilbourn could see that the documents provided by Smarter Fuel and EERC did not match what she obtained from a separate audit her firm had with Hero BX.

This was not merely a paperwork error. Due to the existence of these credits, feedstock on which fuel could be produced (and credits claimed) was often more valuable than the fuel itself. This provided the monetary incentive for the defendant to market his output as feedstock. In addition, if he were selling his product as a fuel, the defendant would have been forced to find companies that actually wanted to burn his used cooking oil. One of the few that did try to burn his output as a fuel, Dickinson College, will testify that the material fouled their boilers  and that

they had to cease using it altogether after several attempts. In contrast, the real fuel producers could process the defendant's used cooking oil into a real fuel, one that could be used in standard diesel engines without modification.

2. *"Ghost" Gallons*

In late 2010, Dunham and Tommaso engaged in a series of transactions with Higher Ground Energy in which they created false documents in order to claim millions of dollars' worth of credits for product they never processed, produced or even saw. Higher Ground was a company engaged in the brokering of various fuels, feedstocks, and by-products, owned by Jeremy Rogers. Rogers had previously operated a biodiesel production facility and had bought used cooking oil from Dunham. Upon hearing that Rogers had brokered a large quantity of glycerine that had been shipped from Canada to Georgia earlier in the year, Dunham told Rogers that Smarter Fuel could claim RINs on the material, and share the proceeds with Rogers. Dunham then inquired whether Ralph Tommaso was interested in participating in the scheme, which he was.

Thereafter Higher Ground exchanged numerous invoices and purchase orders with Smarter Fuel and EERC, making it appear as though he had sold millions of gallons of feedstock to them. Smarter Fuel and EERC then "sold" this fictitious material back to Higher Ground, after generating credits. Thus, Dunham participated in a scheme in which he claimed to have produced millions of gallons of fuel that never really existed. It never went to his plant and was never processed.

10

3.  *Inflated Production Figures*

The defendant likewise implemented a series of schemes which enabled him to fraudulently claim multiple sets of credits on the same material.  For example, the defendant tasked Ken Nicolosi, a financial employee of the company, with creating a monthly spreadsheet, using the sales figures provided by Dunham and Tommaso, to keep track of their sales.  On a monthly basis, from February through December 2011, Nicolosi used the spreadsheet to generate and submit the excise tax credit claims to IRS on behalf of Dunham and Tommaso.  Before submitting such claims, Dunham and Tommaso each reviewed and signed off on the sales figures.  Dunham often amended the figures before they were submitted to the IRS.  However, these amendments always involved making additions to the total, such as adding wastewater amounts and alleged rail car loads for which Nicolosi had no other documentation.  Dunham never reduced the figures prior to submission to IRS.

The spreadsheet given to Nicolosi by Dunham for submitting claims to the IRS included multiple categories for which credits could not be legitimately claimed. The spreadsheet included wastewater disposal, feedstock sales, and double counting of product as it came in and then out of the facility. Nicolosi used these figures in determining the monthly submission amounts for the IRS, and each month David Dunham reviewed the figures and directed Nicolosi to submit the documents.

In another circumstance, Dunham sold material to AMENICO, claiming RINs once. When AMENICO was unable to sell the material, Dunham arranged for Higher Ground to buy it back from AMENICO, and claimed a second set of RINs.

Finally, Dunham and Ralph Tommaso also exchanged invoices for the sole purpose of generating fraudulent RINs. This included an instance in May 2011 where Dunham and Tommaso arranged for the false invoicing of approximately 600,000 gallons of material from EERC to Smarter Fuel. This was done to generate RINs to fulfill a RIN sale negotiated by Ralph Tommaso.

4.  *The Cover-Ups*

The defendant likewise oversaw a series of cover-ups designed to mislead auditors, government agencies, and his customers.  For instance, in early 2010, the IRS notified Dunham that it would be auditing his excise tax claims made in July through September 2009.  Dunham provided IRS with sales records and invoices which he represented were indicative of his business practices.  On their face, these records appear to support Dunham's claims for tax credits.  However, the government has determined, through a review of the Audit Trail function of QuickBooks, Smarter Fuel's accounting system, that the documents provided by Dunham to the IRS had been altered by him the day before the arrival of the IRS audit agent.  Dunham also provided the agent with a QuickBooks summary of all sales, on which he had altered at least 30 entries to create a false impression that the information on the spreadsheet was accurate.  The alterations made by Dunham included changes to customer names, product description, quantity of product sold, and the dollar amount of product sold.  Audit Trail also indicated that, in the days following the visit of the audit agent, Dunham returned the records back to their original state, thus re-balancing his books.

Another audit of Smarter Fuel was conducted in early 2012 by Turner Mason on behalf of Shell Oil.  Dunham knew that the purpose of the audit was to determine the validity of RINs being sold by Smarter Fuel and EERC.  He also knew that failing the Shell audit would result in his company being blacklisted in the industry, making it more difficult for him to sell RINs. During this audit, Dunham assigned his newly hired CFO to be the point person with the audit team. When the auditor asked the CFO about sales to Hero, the CFO sent this inquiry to Dunham, who falsely responded that the only material sent to Hero had not been used to generate RINs.

In preparation for this audit, Dunham directed his employees installed a system for blending diesel into their product.  This system did not exist prior to the arrival of the audit team, despite such blending being a requirement for the IRS credit, a fact that Dunham kept from the auditors.

As discussed above, employees of Smarter Fuel shall testify that Dunham also directed them to alter records of past transactions, making it appear that such transactions legitimately qualified for the subsidies received in the past, and suggesting that the company was rightly positioned for such subsidies in the future.

Following the audit, Dunham had several conversations with Ms. Hilbourn in which he claimed that his customers were using his fuel for "off-road" transportation, and that the large increase in production in the latter part of 2010 was due to stockpiling material. In reality, it was due to the fraudulent scheme he engaged in with Higher Ground, described above.

In another instance, in approximately May 2012, agents from the USDA audited claims made and received by Dunham in the previous years.  For this review, Dunham was required to

show production records supporting his USDA claims over a period of years.  Dunham knew that his claims to USDA were vastly overstated and he could never legitimately produce the supporting documentation.  Therefore, he directed Angela Gionis and other employees to make up invoices and other business records to fill in the gap between what he claimed and what he could prove.  At Dunham's direction, these employees created fake invoices, signed the names of prior employees, and wrinkled the documents to make them appear as if they were generated at the time of the made-up sales, rather than in the days before the USDA agents arrived.  These records were then provided to the USDA agents and were ultimately seized from Dunham's office during the execution of search warrants in this case.

As a consequence of his various crimes, the defendant claimed in excess of $9 million in tax credits, over $5 million in USDA grant payments, and received in excess of $15 million from unsuspecting customers participating in an EPA program.  The vast majority of these subsidies were for product that never existed and/or did not qualify for any subsidies.  The foregoing is a general summary of the evidence the government intends to produce at trial.

## II.   STATUTES CHARGED AND ELEMENTS OF THE OFFENSE

A.  To establish a violation of 18 U.S.C. § 371 (Conspiracy), the government must prove beyond a reasonable doubt that:

1.  Two or more persons agreed to commit offenses against the United States, as charged in the indictment;

2.  The defendant was a party to or member of that agreement;

3.  The defendant joined the agreement or conspiracy knowing of its objectives to commit offenses against the United States and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve common goals or objectives, to commit offenses against the United States; and

14

4. At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement

B. To establish a violation of 18 U.S.C. § 1343 (Wire Fraud)

1. The defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

2. The defendant acted with the intent to defraud; and

3. In advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

C. To establish a violation of 26 U.S.C. § 7206 (Filing False Tax Returns)

1. The defendant made and subscribed and filed an income tax return;

2. The tax return contained a written declaration that it was made under the penalties of perjury;

3. The return was false regarding a material matter;

4. The defendant did not believe the return was true and correct as to that material matter; and

5. The defendant acted willfully.

D. To establish a violation of 26 U.S.C. §7212(a) (Obstructing the Due Administration of the IRS)

1. The defendant knowingly altered or falsified a document;

2. The defendant did so with the intent to impede, obstruct, or influence an investigation or proper administration of a matter, or in contemplation of a matter, or in relation to a matter;

3. The investigation or matter was within the jurisdiction of the federal department or agency, which here is the United States Department of Agriculture, which is a department of the United States.

15

E.  The essential elements of a violation of 18 U.S.C. § 1957 (Money Laundering)

    1.  The defendant engaged, or attempted to engage, in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000;

    2.  The property was derived from a specified unlawful activity; and

    3.  The defendant acted knowingly.

F.  To establish a violation of 18 U.S.C. § 1519 (Obstruction of Federal Investigation)

    1.  The defendant knowingly altered or falsified a document;

    2.  The defendant did so with the intent to impede, obstruct, or influence an investigation or proper administration of a matter, or in contemplation of a matter, or in relation to a matter; and

    3.  The investigation or matter was within the jurisdiction of the federal department or agency, which here is the United States Department of Agriculture, which is a department of the United States.

## III.  <u>ANTICIPATED WITNESSES</u>

The government may call the following witnesses in its case-in-chief:

        1.       Ralph Tommaso

        2.       Ernest Lee Hayes

        3.       Donald Schaeffer

        4.       Michael Kiner

        5.       Connie Lausten

        6.       Tom Bond

        7.       David Haselschwerdt

        8.       Chris Peterson

        9.       Paul Nees

      10.       Tony Giunta

11.    Jeremy Rogers

12.    Donna Wisneski

13.    Jody Kirk

14.    Ken Nicolosi

15.    Chris Peck

16.    Robert Vitale

17.    Tom Hall

18.    Angela Gionis

19.    Elizabeth Hilbourn

20.    Tom Bolus, IRS

21.    Stuart Rich, IRS

22.    Jeff Ross, IRS (Retired)

23.    Dane Bowerman, USDA (Retired)

24.    Jennifer Lynn, EPA

25.    Lisa Noty, USDA

26.    Tony Miller, EPA

27.    Michel Monconduit, IRS (Retired)

The government reserves the right to supplement this witness list as may be required.

## IV.   LEGAL AND EVIDENTIARY ISSUES

The government has filed, or intends to file, the following motions prior to trial.  This list is not intended to be exhaustive and the government reserves the right to file additional motions as necessary.

### A.   Testimony of Elmer Meyer, IRS Revenue Agent

Elmer Meyer performed the audit on behalf of the IRS in 2010. The government anticipated calling Elmer Meyer as a witness at trial. Mr. Meyer recently suffered an unexpected and significant medical event. The government anticipates requesting special accommodations for Mr. Meyer, including allowing an appearance by teleconference or the taking of a Rule 15 deposition.

### B.   Presenting a Position Inconsistent with Prior Proffered Statements

Should the defendant present a position contrary to his prior proffered statements, the government intends to admit the statements themselves to rebut this position.  The Court granted this motion on March 26, 2019.  Doc. no. 146.

### C.   Introduction of Intrinsic and 404(b) Evidence

The government intends to introduce as evidence the directions the defendant gave to his bookkeeper to falsely categorize personal expenses as business expenses, in order to lower the amount he owed in taxes.  Motion filed and pending Order of the Court.

### D.   Motion for Declaration of Intent to Offer Reliance Defense

The government has sought a declaration by the defendant of any reliance defense he intends to offer at trial.  The Court granted this motion on April 2, 2019.  Doc. no. 149. On April

3, 2019, the defendant filed a document with the court indicating he "may" offer a reliance defense. Doc. no. 153.

###### E.        Introduction of Regulatory Expert Testimony

The government intends to present experts in each of the regulatory programs at issue. These witnesses will provide a framework for the jury to understand these complex programs. The Court issued an Order approved the use of such experts on April 2, 2019.  Doc. at 150.

###### F.        Stipulations and Potential Stipulation

The parties have agreed to stipulate to the authenticity and admissibility of the following records:

- USA000197903 through USA000197980  (records of ThinkTrade)
- USA000197984 through USA000198068 (records of ThinkTrade)
- QuickBooks records seized, imaged, and processed by the RCFL

The parties have agreed to stipulate to the authenticity of the following records:

- GOOGLE-00000001 through GOOGLE-00151395
- GOOGLEDOCS-00000001 through GOOGLEDOCS-00000844

The parties have agreed to stipulate to the location where certain evidence was recovered during the search warrants, specifically:

- Boxes 56, 91-93, 115, 116, 120, 124.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney


 s/ John Gallagher                 
JOHN GALLAGHER
Assistant United States Attorneys

ADAM C. CULLMAN
Trial Attorney, United States Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I caused a copy of the Government's Trial Memorandum be served by electronic filing upon:

Mark E. Cedrone, Esq.
123 South Broad Street, Suite 810
Philadelphia, PA 19109
mec@cedrone-mancano.com

*/s/ John Gallagher*
JOHN GALLAGHER
Assistant United States Attorney

Date: ___April 3_____, 2019

21